UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————x

THE NEW YORK TIMES COMPANY,                    :
                                               :
                    Plaintiff,                 :
                                               :          16 Civ. 3098 (JSR)
                                               :
                                               :
              - against -                      :
                                               :
CENTRAL INTELLIGENCE AGENCY,                   :
                                               :
                    Defendant.                 :

———————————————————————————————x


## PLAINTIFF'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS CROSS-MOTION
## FOR PARTIAL SUMMARY JUDGMENT AND IN
## OPPOSITION TO DEFENDANT'S MOTION
## <u>FOR SUMMARY JUDGMENT</u>

David E. McCraw
Tali R. Leinwand
The New York Times Company
Legal Department
620 Eighth Avenue
New York, NY 10018
Phone: (212) 556-4031
Facsimile: (212) 556-1009
Email: mccraw@nytimes.com
*Counsel for Plaintiff*

60478

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .........................................................................................2

   I.    THE FOIA REQUEST .................................................................................2

   II.    THE TIMES'S REPORTING ABOUT THE CASUALTIES OF IRAQ'S
       ABANDONED CHEMICAL WEAPONS .................................................3

   III.    THE CIA'S OFFICIAL ACKNOWLEDGMENTS ...................................5

          A.  The Duelfer Report of 2004 .............................................................6

          B.  NIC Reports Declassified in 2009 ...................................................7

          C.  CIA Memorandum Declassified in 2010 .........................................7

          D.  Department of Defense Memorandum Declassified in 2011............8

          E.  CIA Reports Declassified in 2012 and 2013.....................................8

          F.  NGIC Report Declassified in 2014 ..................................................9

          G.  2014 Official Disclosures Following the Article ..............................9

          H.  2014 Senate Report ........................................................................10

          I.  CIA Report Declassified in 2014 ...................................................11

ARGUMENT.............................................................................................................11

   I.    THE CIA'S GLOMAR RESPONSE IS SUBJECT TO *DE NOVO* REVIEW ..........11

   II.    THE CIA MUST SHOW THAT THE EXISTENCE OR NONEXISTENCE OF THE
       THREE DOCUMENTS IS ITSELF A SECRET PROTECTED BY EXEMPTIONS 1
       AND 3 OF FOIA ........................................................................................13

          A.  The CIA Must Tie Its Glomar Response to Specific Exemptions ..................14

          B.  Exemptions 1 and 3 Have Defined Limits......................................................15

          C.  The CIA Must Provide "Reasonably Detailed" Declarations Showing that the
             Need for Secrecy is "Logical and Plausible"..................................................16

60478

i

III.   THE CIA HAS FAILED TO SHOW THAT ACKNOWLEDGING THE
       EXISTENCE OF THE DOCUMENTS WOULD HARM NATIONAL SECURITY
       OR REVEAL SECRET SOURCES AND METHODS ...............................................18

       A.  Official Disclosures Have Vitiated the CIA's Right to Use a Glomar
           Response ........................................................................................................19

       B.  The CIA Declaration Fails to Show that Under Either Exemption 1 or
           Exemption 3 the Agency Was Justified in Declining to Acknowledge the
           Three Documents ...........................................................................................21

CONCLUSION.........................................................................................................................24

60478

# TABLE OF AUTHORITIES

## CASES

Adamowicz v. Internal Revenue Serv., 552 F. Supp. 2d 355 (S.D.N.Y. 2008) ............................12

Am. Civil Liberties Union v. Cent. Intelligence Agency, 710 F.3d 422 (D.C. Cir. 2013)............14

Am. Civil Liberties Union v. Clapper, 785 F.3d 787 (2d Cir. 2015)...............................................17

Am. Civil Liberties Union v. Dep't of Def., 389 F. Supp. 2d 547 (S.D.N.Y. 2005).....................11

Associated Press v. Dep't of Def., 498 F. Supp. 2d 707 (S.D.N.Y. 2007) ....................................16

Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143 (2d Cir. 2010) .....11

Campbell v. Dep't of Justice, 164 F.3d 20 (D.C. Cir. 1998) .........................................................16

Carney v. Dep't of Justice, 19 F.3d 807 (2d Cir. 1994)................................................................12

Dep't of State v. Ray, 502 U.S. 164 (1973)...................................................................................12

Halpern v. Fed. Bureau of Investigation, 181 F.3d 279 (2d Cir. 1999)................................. *passim*

Milner v. Dep't of the Navy, 562 U.S. 562 (2011)...................................................................11, 12

Navasky v. Cent. Intelligence Agency, 499 F. Supp. 269 (S.D.N.Y. 1980)..................................15

N.Y. Times Co. v. Dep't of Justice, 756 F.3d 100 (2d Cir. 2014)......................................15, 20, 21

Phillippi v. Cent. Intelligence Agency, 546 F.2d 1009 (D.C. Cir. 1976) ........................................1

Wilner v. Nat'l Sec. Agency, 592 F.3d 60 (2d Cir. 2009)...................................................11, 14, 15

Wilson v. Cent. Intelligence Agency, 586 F.3d 171(2d. Cir. 2009) ...............................................20

Wolf v. Cent. Intelligence Agency, 473 F.3d 370 (D.C. Cir. 2007)...............................................11

Wood v. Fed. Bureau of Investigation, 432 F.3d 78 (2d Cir. 2005)...............................................11

## STATUTES, REGULATIONS, AND RULES

5 U.S.C. § 552.......................................................................................................... *passim*

50 U.S.C. § 3024.............................................................................................................15

75 Fed. Reg. 707 (Executive Order 13,526) ..............................................................14, 15, 22, 23

Fed R. Civ. P. 56.................................................................................................................................12

iv

60478

## PRELIMINARY STATEMENT

Plaintiff The New York Times Company ("The Times") respectfully submits this memorandum of law in support of its cross-motion for partial summary judgment and in opposition to the motion for summary judgment filed by Defendant Central Intelligence Agency ("CIA").

This is a case of claimed secrecy in the name of national security taken far past the point of reason.  Over the past two years, The Times has reported and written about a troubling chapter in the history of the United States involvement in Iraq following 9/11:  the harm inflicted on hundreds of American service personnel who were exposed to chemical weapons while searching out and destroying munition stockpiles after the fall of Saddam Hussein.  Intertwined with that narrative is the story of the Government's efforts to keep secret the injuries and the mismanagement of the mission.

Under the Freedom of Information Act ("FOIA"), The Times sought three specific documents – identified by title and month of publication – from the CIA concerning the injuries and the efforts to locate and neutralize Iraqi munition facilities.  The CIA responded by declining to say whether the documents existed, citing FOIA's national security exemptions – a so-called "Glomar response."[1]

The central point in the CIA's argument, that merely acknowledging that the three documents exist will disclose the CIA's interest in the munitions and the CIA's sources and methods, finds no support in the law of FOIA or in the facts of this case.  Disclosure of injuries inflicted on U.S. personnel is not a national security secret that must be protected to keep America safe.  Nothing about acknowledging the documents will reveal sources and methods.

---

[1] The "Glomar response" was first recognized by the courts in <u>Phillippi v. Cent. Intelligence Agency</u>, 546 F.2d 1009, 1010–11 (D.C. Cir. 1976), a FOIA case in which the plaintiff sought records from the CIA concerning a Cold War-era vessel called the Hughes Glomar Explorer.

And the final – and fatal – flaw in the CIA's case:  the agency has repeatedly and publicly acknowledged its interest in the chemical weapons and its role in trying to locate them.

The CIA's motion should therefore be denied, and the Court should direct the CIA to (i) acknowledge the three documents, (ii) produce the documents subject to any redactions that the agency believes are justified, and (iii) set further motion practice for any challenges that The Times has to such redactions.

## STATEMENT OF FACTS

## I.

## THE FOIA REQUEST

This case grows out of a FOIA request in which The Times sought from the CIA three specific documents relating to chemical weapons uncovered in the aftermath of the U.S. invasion of Iraq (the "Request").  (See Ex. A to Declaration of Antoinette B. Shiner, dated June 10, 2016 ("Shiner Decl.").)  The three reports, identified by title and approximate month of publication, contain some of the CIA's findings about Iraq's chemical warfare program and the injuries incurred by U.S. service personnel who were sent out to destroy the munition stockpiles in Iraq following the fall of Saddam Hussein.[2]  (See id.)

The CIA denied The Times's Request on December 30, 2013, refusing to confirm or deny the existence of the three requested documents.  (See Shiner Decl. Ex. B.)  In issuing its Glomar response, the agency relied on FOIA Exemption 1, which exempts properly classified information, and on two statutes, Section 6 of the CIA Act of 1949 and Section 102A(i)(1) of the

---

[2] The three requested documents were: (1) "A document believed to be published in August 2007, bearing the approximate title, 'Iraq: Recovered CW Munitions Probably Remnants of Pre-1991 CW Program,'" (2) "A document believed to be published in Dec. 2006 as a CIA WIRe report and titled, 'Iraq: Recovered Pre-1991 Mustard Rounds May Pose Localized Threat,'" and (3) "A document believed to be published in March 2007 as a CIA WIRe report and titled, 'Iraq: US Forces Experienced First Sulfur-Mustard Related Injuries.'"  (See Shiner Decl. Ex. A.)

60478                                          2

National Security Act of 1947, through FOIA Exemption 3, which exempts information pursuant to statute.[3]  (See id.)

The Times filed an administrative appeal with the CIA in January 2014 (the "Appeal"). (See Shiner Decl. Ex. C.)  The CIA denied the Appeal in its entirety on June 3, 2014 and stated that the agency had properly invoked FOIA Exemptions 1 and 3 in issuing a Glomar response. (See Shiner Decl. Ex. E.)

## II.

### THE TIMES'S REPORTING ABOUT THE CASUALTIES OF IRAQ'S ABANDONED CHEMICAL WEAPONS

The Times seeks the three reports as part of its ongoing reporting about the injuries sustained by U.S. service personnel who were exposed to the chemical weapons – injuries that were largely covered up by the Government.  The first of The Times's articles (the "Article") disclosed what the Government had been attempting to keep out of public view:  that from 2004 to 2011, American and American-trained Iraqi troops repeatedly encountered, and in some instances were seriously wounded by, thousands of chemical weapons that were left over from the arms program that Iraq had amassed in the 1980s during the Iraq-Iran War.  (See Declaration of David E. McCraw, dated July 1, 2016 ("McCraw Decl."), Ex. A.)  Subsequent government disclosures prompted by the Article revealed that the number of American troops affected was over 600.[4]

The Bush administration had premised the Iraq War on the alleged existence of an active arsenal of weapons of mass destruction ("WMD") in the hands of Saddam Hussein.  But during

---

[3] As set forth in its brief, the agency no longer claims that the CIA Act applies.  See Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("CIA Mem."), at 8–9.

[4] See C.J. Chivers, More Than 600 Reported Chemical Exposure in Iraq, Pentagon Acknowledges, N.Y. Times, Nov. 6, 2014, available at https://www.nytimes.com/2014/11/07/world/middleeast/-more-than-600-reported-chemical-weapons-exposure-in-iraq-pentagon-acknowledges.html (quoting Jerome Buller, a spokesman for the Army surgeon general).

60478

3

the American occupation of Iraq, what American troops found instead of an active WMD arsenal were old chemical munitions in hidden caches and roadside bombs that were actually remnants of an arms program that Iraq had rushed into production in the 1980s during the Iran-Iraq war, as the Article laid out.  (See McCraw Decl. Ex. A.)

    The discovery of these munitions had serious consequences for U.S. personnel who were sent out to locate and destroy Hussein's munitions and were not properly warned that chemical weapons might be present or given proper protective gear.  Discovery of these abandoned chemical weapons, which included sarin and sulfur mustard agent, occurred throughout the United States's eight-year involvement in Iraq and on varying scales:  the largest discovery occurred in 2006, when American troops found more than 2,400 Borak rockets at Camp Taji, a former Republican Guard compound, as detailed in the Article.  (See id. at 9.)  In turn, exposed American troops reported experiencing symptoms ranging from memory lapses and problems with balance to tingling sensations, burns, blisters, and shortness of breath.  (See McCraw Decl. Ex. A.)

    But instead of responding to the troops' exposure and resulting injuries with proper medical care and official recognition of the troops' wounds, the Government either dismissed the reports of injuries or tried to cover them up and consistently failed to follow appropriate protocol, as the Article recounted.  (See id.)  One soldier reported that during an initial visit to a medical clinic after handling an artillery shell containing sarin, the medical staff acted as if the soldier were lying or on drugs.  Another exposed soldier reported that his supervisors classified his medical case as "top secret" and told him to tell family members that he had been exposed to "industrial chemicals."  In 2004, the Article reported, the Army distributed detailed new instructions for treating troops exposed to warfare agents, but these steps were never followed.

60478                                    4

Among the theories for why the Government held back information about the warheads and the injuries was the belief that the Bush Administration was reluctant to look wrong once more about the war in Iraq. Others suggested that the administration feared publicity about the fact that the munitions appeared to have been designed in the United States, manufactured in Europe, and filled in chemical agent production lines built in Iraq by Western companies. (See id. at 3.)

The Article also reported cover-ups and secret-keeping among various agencies. In 2005 and 2006, for example, military personnel collected hundreds of chemical rockets, warheads, and shells, but the Pentagon did not provide this information to the Senate Select Committee on Intelligence ("SSCI") as it worked in the summer of 2006 examining intelligence claims about Iraq's weapons programs. (See id. at 9.) As a result, the SSCI's final report was inaccurate when it was released in September 2006 and provided a figure for the number of chemical munitions found that was only one-sixth of the Pentagon's internal tallies. (See id. at 10.) The Article also reported that the Government lost track of the chemical weapons its troops found, left large caches unsecured, and did not warn those in the vicinity as the troops exploded chemical ordnance in the open air. (See id. at 3.)

### III.

### THE CIA'S OFFICIAL ACKNOWLEDGMENTS

The CIA has justified its Glomar response principally by claiming a need to keep secret whether the agency had an interest in Iraqi chemical weapons. But even before The Times Request, various official disclosures by the CIA and other governmental agencies had already made clear the deep interest of the CIA (as well as other agencies) in Hussein's chemical weaponry, the CIA's role in trying to locate them, and the inevitable challenges that would be

posed by their discovery.  Subsequent official disclosures followed publication of the Article.

Among the relevant disclosures:

### A.  The Duelfer Report of 2004

On October 6, 2004, the Iraq Survey Group ("ISG"), a multinational taskforce established

to search for unconventional weapons in Iraq, made public a lengthy report on the state of Iraq's

WMD programs, known as the "Duelfer Report" for ISG's leader Charles Duelfer, a former

adviser to the Director of Central Intelligence.  (See McCraw Decl. Ex. B.)[5]  Duelfer emphasized

in a book he wrote about the Iraq that the Duelfer Report was a "CIA publication" and that the

CIA, which oversaw the report's production and declassification, was heavily involved in

deciding what information to release to the public.  See Charles Duelfer, Hide and Seek:  The

Search for Truth in Iraq 449–51 (2009) (excerpts reproduced as McCraw Decl. Ex. D).  In fact,

Duelfer was asked to head the ISG by the CIA director.  (See id. at 2.)

The report included sections describing the ISG's recovery and destruction of a small

number of chemical warheads and shells that year.  The report specifically described the ISG's

recovery of "dozens of additional chemical munitions, including artillery rounds, rockets, and a

binary Sarin artillery projectile" (see McCraw Decl. Ex. B, at 29), and noted it could not

"discount the possibility that a few large caches of munitions remain to be discovered within

Iraq" (see id. at 34) and that more remnants "may be found in the months and years ahead."  (See

id. at 31.)[6]  An addendum also predicted that "Iraq and Coalition Forces will continue to discover

small numbers of degraded chemical weapons, which the former [Iraqi] Regime mislaid or

improperly destroyed prior to 1991."  (See McCraw Decl. Ex. C.)

---

[5] See Douglas Jehl, The Issue of War: Inspector's Judgment; U.S. Report Finds Iraqis Eliminated Illicit
Arms in 90's, N.Y. Times, Oct. 7, 2004, available at
https://www.nytimes.com/2004/10/07/washington/the-issue-of-war-inspectors-judgment-us-report-finds-
iraqis.html (reporting that the Duelfer Report was made public on October 6, 2004).
[6] Pin citations for exhibits use the pagination of the original document.

60478

**B.  NIC Reports Declassified in 2009**

In 2009, two reports were declassified by the National Intelligence Council ("NIC"). (See McCraw Decl. Exs. E and F.)  The CIA, along with other agencies, participated in the preparation of the reports.  (See id.)  The two reports are available through the CIA's FOIA Electronic Reading Room, a repository of released documents.  (See id.)[7]

One report, "Principal Challenges in Post-Saddam Iraq" originally written in January 2003 at the request of the State Department, noted that "[a]n immediate challenge in post-Saddam Iraq will be accounting for all of the WMD" and that "[l]ong-term foreign monitoring and inspections likely would be necessary to ensure that Iraq's WMD infrastructure was dismantled and destroyed."  (See McCraw Decl. Ex. E (also noting the possibility that Hussein would use chemical weapons against his own people and Coalition forces).)  At the time the report was drafted, the NIC reported to the Director of Central Intelligence.  (See id.)

The other report, "Iraq:  Unusual Logistical Activities in Preparation for an Anticipated US-Led Campaign," originally drafted in May 2002, discussed the possibility that since mid-March 2002, Iraq had been moving chemical weapons in anticipation of a United States-led military campaign.  (See McCraw Decl. Ex. F.)  The report also detailed various Iraqi facilities' known or suspected storage of different chemical munitions.  (Id.)

**C.  CIA Memorandum Declassified in 2010**

In August 2010, the CIA declassified a memorandum, "Impact and Implications of Chemical Weapons Use in the Iran-Iraq War."  (See McCraw Decl. Ex. G.)  It was originally written by the CIA in April 1988.  (See id.)

---

[7] See CIA, Library: Freedom of Information Act Electronic Reading Room, http://www.foia.cia.gov/ (last visited June 30, 2016).

That report examined "the degree to which chemical warfare (CW) in the Iran-Iraq conflict had been effective and discusse[d] the factors driving decisions to develop and use chemical weapons." (See id. at 3.) The CIA noted that "[a]s more nations acquire a chemical capability, military and peacekeeping forces must expect the threat of either intentional or inadvertent exposure to chemical attack in any regional attack in the future." (See id. at 1.)

### D. Department of Defense Memorandum Declassified in 2011

In January 2011, the Department of Defense declassified a memorandum that Glen Shaffer, then the Direct for Intelligence of the Joint Staff, had sent to then-Secretary of Defense Donald Rumsfeld. (See McCraw Decl. Ex. H.) The memorandum included information compiled around August and September 2002 and provided to Secretary Rumsfeld in September 2002. (See id.) It detailed what some members of the intelligence community knew about Iraqi WMD programs, including the extent of its data on Hussein's chemical weapons program. (See id.)

### E. CIA Reports Declassified in 2012 and 2013

In June 2012 and November 2013, the CIA declassified reports that it had written as part of its "Iraq WMD Retrospective Series" that addressed the agency's post-invasion understanding of Iraq's WMDs. (See McCraw Decl. Exs. I and J.) The report declassified in June 2012, "Misreading Intentions: Iraq's Reaction to Inspections Created Picture of Deception," was originally published in January 2006. (See McCraw Decl. Ex. I.) It broadly referenced Iraq's concealment of important aspects of its chemical weaponry programs in March 1992 and noted Iraq's destruction of chemical warfare warheads in the summer of 1991. (See id.)

The second report declassified in November 2013, "Iraq:  No Large-Scale Chemical Warfare Efforts Since Early 1990s," was written in January 2005. (See McCraw Decl. Ex. J.) It

60478

8

stated that "Iraq probably did not pursue significant chemical warfare (CW) efforts after 1991." (See id. at i.)  The CIA concluded:  "We have seen no credible indications that Iraq pursued any significant CW efforts after 1991, and it is unlikely that any militarily effective stockpiles of Iraqi chemical weapons remain.  Small numbers of forgotten, discarded, or demilitarized chemical weapons from Iraq's pre-1991 stockpile continue to surface, however, and pose a modest potential threat to Coalition forces."  (See id.)  It also stated that "[c]oalition forces in Iraq potentially face a threat from chemical weapons even absent a large, centralized Iraqi CW program."  (See id. at 10.)

## F.  NGIC Report Declassified in 2014

In 2014, the National Ground Intelligence Center ("NGIC") declassified a report, "Iraq: Chemical Weapons Continue to Be Recovered."  (See McCraw Decl. K.)  That report, originally published in April 2006, provided an overview of the chemical munitions recovered in Iraq since May 2004.  (See id.)  It noted that many of the recovered chemical weapons included al Borak rocket warheads, many of which contained the nerve agent sarin.  (See id. at 1.)  The report detailed past efforts to locate and destroy Iraq's chemical weapon stockpiles as well as specific examples of reported Iraqi use of chemical weapon agents.  (See id. at 9.)  While not directly attributed to the CIA, it appears to track information contained in the declassified CIA documents.

## G.  2014 Official Disclosures Following the Article

Little secrecy now surrounds the injuries to U.S. personnel as a result of various official announcements.  In October 2014, the Pentagon announced it was initiating a review of how the military had handled encounters with thousands of abandoned chemical munitions during the

American occupation.[8]  That review showed that over 600 American service members since 2003 had reported to military medical staff members that they believed they were exposed to chemical warfare agents in Iraq.[9]  In March 2015, Army Under Secretary Brad Carson publicly stated that the military had not followed its own policies for caring for troops exposed to old and abandoned chemical munitions that had been scattered around Iraq.[10]

H.  **2014 Senate Report**

The U.S. Senate Select Committee on Intelligence released with redactions the executive summary of its "Committee Study of the [CIA's] Detention and Interrogation Program" (the "Senate Report") in December 2014.  (See McCraw Decl. Ex. L.)  It revealed that the CIA had sought information about Iraqi chemical weapons in the interrogation of at least one detainee. The Senate Report disclosed that a Libyan national named Ibn Shaykh al-Libi "reported while in [redacted] custody that Iraq was supporting al-Qa'ida and providing assistance with chemical and biological weapons."  (See id. at 141.)  According to the Senate Report, al-Libi later recanted "after he was rendered to CIA custody" and claimed that he had only made those statements while being tortured.  (See id.)

---

[8] See C.J. Chivers, Troops to Be Checked for Chemical Exposure in Iraq, N.Y. Times, Oct. 29, 2014, available at https://www.nytimes.com/2014/10/30/world/middleeast/iraq-chemical-weapons-pentagon-response.html.

[9] See C.J. Chivers, More Than 600 Reported Chemical Exposure in Iraq, Pentagon Acknowledges, N.Y. Times, Nov. 6, 2014, available at https://www.nytimes.com/2014/11/07/world/middleeast/-more-than-600-reported-chemical-weapons-exposure-in-iraq-pentagon-acknowledges.html (quoting Jerome Buller, a spokesman for the Army surgeon general).

[10] See C.J. Chivers, Veterans Hurt by Chemical Weapons in Iraq Get Apology, N.Y. Times, Mar. 25, 2015, available at https://www.nytimes.com/2014/11/07/world/middleeast/-more-than-600-reported-chemical-weapons-exposure-in-iraq-pentagon-acknowledges.html.

I. **CIA Report Declassified in 2014**

In 2014, a 93-page CIA report that was used internally by the Bush administration to justify the invasion of Iraq, "Iraq's Continuing Programs of Weapons of Mass Destruction," was declassified.  (See McCraw Decl. Ex. M.)  The report was written in October 2002.  (See id.)

The document includes an entire section devoted to the CIA's findings and analysis of Iraq's chemical warfare program (deemed "rebuilt and expanding").  (See id. at 28–35)  The report predicted that Hussein probably had stocked a few hundred metric tons of chemical warfare agents and could rebuild his infrastructure to produce chemical weaponry.  (See id.)

**ARGUMENT**

**I.**

**THE CIA'S GLOMAR RESPONSE IS
SUBJECT TO *DE NOVO* REVIEW**

Under FOIA, the Court undertakes *de novo* review of an agency's decision to withhold information.  5 U.S.C. § 552(a)(4)(B); see Wolf v. Cent. Intelligence Agency, 473 F.3d 370, 374 (D.C. Cir. 2007) (*de novo* review required in Glomar case); Halpern v. Fed. Bureau of Investigation, 181 F.3d 279, 291 (2d Cir. 1999) (reviewing *de novo* an assertion of national security exemption and finding Government's declarations inadequate); Am. Civil Liberties Union v. Dep't of Def., 389 F. Supp. 2d 547, 552 (S.D.N.Y. 2005) (detailing judge's responsibility to examine *de novo* if documents are properly withheld under national security exemptions).  Although courts are to give agency affidavits a presumption of good faith, Wood v. Fed. Bureau of Investigation, 432 F.3d 78, 85 (2d Cir. 2005), that does not end the inquiry. Cf. Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 151 (2d Cir. 2010) ("[A] test that permits an agency to deny disclosure because the agency thinks it best to do so (or convinces a court to think so, by logic or deference) would undermine 'the basic policy

11

that disclosure, not secrecy, is the dominant objective of [FOIA].'") (quoting Dep't of the Air Force v. Rose, 425 U.S. 352, 361 (1976)).   Agency affidavits must be "reasonably detailed" to carry the Government's burden of proof.  See Wilner v. Nat'l Sec. Agency, 592 F.3d 60, 69 (2d Cir. 2009); Wood, 432 F.3d at 85.

The burden remains with the Government to show that it is permitted to withhold the requested information under one of FOIA's statutory exemptions.  See 5 U.S.C. § 552(b); Milner v. Dep't of Navy, 562 U.S. 562, 565 (2011).  Those exemptions are to be narrowly construed, and the courts are to resolve all doubts in favor of disclosure.  See Milner, 562 U.S. at 563 (citing Fed. Bureau of Investigation v. Abramson, 456 U.S. 615, 630 (1982)).

FOIA's underlying principles are embodied in that legal framework.  FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies."  See Halpern, 181 F.3d at 286 (citing cases).  It "was enacted to facilitate public access to Government documents" and "was designed to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'"  Dep't of State v. Ray, 502 U.S. 164, 173 (1991) (quoting Rose, 425 U.S. at 361).

FOIA litigation is typically resolved by cross-motions for summary judgment.  See, e.g., Carney v. Dep't of Justice, 19 F.3d 807, 812–13 (2d Cir. 1994); Adamowicz v. Internal Revenue Serv., 552 F. Supp. 2d 355, 360 (S.DN.Y. 2008).[11]   Under Federal Rule of Civil Procedure 56(c), summary judgment is warranted when, viewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact.  See Fed. R. Civ. P. 56.

---

[11] Like Defendant, The Times has not submitted a Local 56.1 statement in accordance with the standard practice in FOIA cases in this District.

## II.

### THE CIA MUST SHOW THAT THE EXISTENCE
### OR NONEXISTENCE OF THE THREE
### DOCUMENTS IS ITSELF A SECRET PROTECTED
### BY EXEMPTIONS 1 AND 3 OF FOIA

Inevitably in national-security FOIA cases, the Government leans on the courts to stand down and not question the decision to classify information.  (See CIA Mem. at 3–4.)  That view is belied by FOIA's own history.  When Congress amended FOIA in 1974, it specifically empowered the courts to undertake *de novo* review "in *all* cases" and "extended the language of FOIA's provision for *in camera* review to encompass Exemption 1."  Halpern, 181 F.3d at 291 (emphasis added).   As such, "blind deference is precisely what Congress rejected when it amended FOIA in 1974."  Id. at 293 ("That Congress felt strongly about this issue is shown by the fact" that Congress ultimately overcame President Ford's veto to pass the amendment).  Although the Government routinely portrays classification as a precisely calibrated system for assuring just the right amount of secrecy to safeguard the security of the nation, the recent controversy over Hillary Clinton's emails has laid bare how subjective classification decisions are – and why the courts should not give undue deference to claims of classification.[12]  When the intelligence services declared that certain parts of the emails were classified, the Department of State announced that it disagreed and pointed out what should by now be obvious: "Classification is rarely a black and white question."[13]

---

[12] See Josh Gerstein, Hillary Fights Back on Classified Emails, POLITICO (Aug. 19, 2015, 4:00 pm), http://www.politico.com/story/2015/08/hillary-clinton-fights-back-on-classified-documents-121532 (quoting National Security Archive Executive Director Tom Blanton as saying that the Government's classification process is unpredictable).

[13] See Michael S. Schmidt, Second Review Says Classified Information Was in Hillary Clinton's Email, N.Y. Times, Sept. 7, 2015, available at http://www.nytimes.com/2015/09/08/us/politics/second-review-says-classified-information-was-in-hillary-clintons-email.html (quoting State Department spokesperson John Kirby).

60478

President Obama, just recently, made the same point in public comments about the Clinton emails, conceding how imprecise the "classified" label is: "There's classified, and then there's classified.  There's stuff that is really top-secret top-secret, and there's stuff that is being presented to the president or the secretary of state, that you might not want on the transom, or going out over the wire, but is basically stuff you could get in open-source."[14]  That assessment of the realities of overclassification rings true here where the CIA claims that even acknowledging the existence of three documents will jeopardize the safety of the nation.

### A.  The CIA Must Tie Its Glomar Response to Specific Exemptions

The threshold issue in a Glomar case is *not* whether the information in the underlying documents is properly classified and exempt from FOIA.  Instead, the threshold issue is whether the very existence or non-existence of the documents is itself a secret that falls within FOIA's exemptions.

What that means is that "an agency must tether its refusal to respond to one of the nine FOIA exemptions – in other words, a government agency may . . . refuse to confirm or deny the existence of certain records . . . if the FOIA exemption would itself preclude the acknowledgment of such documents."  Wilner, 592 F.3d at 68 (internal quotation marks and citation omitted).  Where a Glomar response is found to be unjustified, "the case must . . . proceed to the filing of a Vaughn index or other description of the kind of documents the Agency possesses, followed by litigation regarding whether the exemptions apply to those documents."

---

[14]  See Michael D. Shear, Obama Says Hillary Clinton Wouldn't Intentionally Endanger U.S. With Emails, N.Y. Times, Apr. 10, 2016, available at http://www.nytimes.com/2016/04/11/us/politics/obama-hillary-clinton-email-fox-news.html.

60478

Am. Civil Liberties Union v. Cent. Intelligence Agency, 710 F.3d 422, 432 (D.C. Cir. 2013).[15]

Here the CIA relies on Exemptions 1 and 3.

### B. Exemptions 1 and 3 Have Defined Limits

Exemption 1 allows agencies to withhold information if it is "in fact properly classified pursuant to [an] Executive order."  5 U.S.C. § 552(b)(1).  Under Executive Order 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009), classification is permitted only as to information whose disclosure "*reasonably could be expected to cause identifiable or discernible damage* to the national security" and "pertains to" one of eight enumerated topics. E.O. 13,526 § 1.4 (emphasis added).[16] There are other important limits.  Most notably, the Executive Order prohibits classification when its purpose is to "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of national security."  Id. § 1.7.

Similarly, Exemption 3 is not boundless.  Exemption 3 incorporates into FOIA confidentiality required by other statutes.  5 U.S.C. § 552(b)(3).  Here, the CIA relies upon Section 102A(i)(1) of the National Security Act of 1947, 50 U.S.C. § 3024.  That provision protects secret "intelligence sources and methods" from unauthorized disclosure.  Accordingly, in reviewing the Glomar response, the Court is to determine initially whether the CIA's

---

[15]   Because The Times has identified the documents, a Vaughn index would not be needed.  Instead, the right next step would be for the CIA to acknowledge the three documents and release any non-exempt portions of the documents, with The Times then permitted to challenge the withholding.

[16] As set forth in E.O. 13,526 § 1.4, these topics are: (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security; (f) United States Government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; and (h) the development, production, or use of weapons of mass destruction.

60478

acknowledgment that the three documents exists or do not exist would in fact disclose sources and methods.

### C.  The CIA Must Provide "Reasonably Detailed" Declarations Showing that the Need for Secrecy is "Logical and Plausible"

Under either exemption, the Government's explanation for withholding information must be "logical and plausible."  N.Y. Times Co. v. Dep't of Justice, 756 F.3d 100, 119 (2d Cir. 2014) (quoting Gardels v. Cent. Intelligence Agency, 689 F.2d 1100, 1105 (D.C. Cir. 1982)); Navasky v. Cent. Intelligence Agency, 499 F. Supp. 269, 274 (S.D.N.Y. 1980) (holding that agency failed to show that materials sought "logically fall into the categories of 'intelligence sources and methods'").   The agency affidavits must be "reasonably detailed."   Wilner, 592 F.3d at 69.  The agency's burden is to provide a "relatively detailed analysis" of how the proffered exemptions apply to the information being withheld.  Halpern, 181 F.3d at 290.  While the courts are to accord "substantial deference" to agency affidavits pertaining to national security, Associated Press v. Dep't of Def., 498 F. Supp. 2d 707, 710 (S.D.N.Y. 2007), "deference is not equivalent to acquiescence."  Campbell v. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998); see also Halpern, 181 F.3d at 295 ("deference to . . . a conclusory 'catch-all' assertion is inappropriate"); Associated Press, 498 F. Supp. 2d at 711 (applying "thorough scrutiny" of the agency's documents after finding that the Department of Defense's affidavit failed to provide "sufficient particularization as to allow the court to make any informed determination of whether any given redaction satisfied Exemption 1").

As much as the Government pushes the deference button in FOIA cases, it is instructive to return to Halpern and remember exactly what the Second Circuit said:  FOIA inevitably involves "tension in balancing the public interest in having the government operate in the sunshine against the interest set forth in the exemptions that may . . . keep the public in the dark,"

60478

but in the end, FOIA puts "special emphasis on granting the fullest possible disclosure."  181 F.3d at 285.  The court noted that it "must analyze" the Government's declarations.  Id.  And that analysis was not done in Halpern from 30,000 feet with the wave of a hand.  Consider the Second Circuit's review of one declaration presented by the Government:  "Although the author of one of the declarations wrote much, she said little; and she said nothing in particular that would justify withholding the documents the requester sought."  Id.

That level of judicial analysis, while it may be considered deferential, still requires a court to look at the reasons proffered for secrecy, assure that the agency has provided "reasonable detail," and make certain that the agency's justification truly applies to the particular information withheld.

Such an analysis is not an empty bit of formalism.  There would be serious consequences for democracy if the intelligence agencies were allowed to get by on generic assertions about the importance of secrecy.  While the executive branch is given substantial latitude to decide what should be classified, that latitude becomes an unchecked, and uncheckable, power unless the courts exercise some oversight via FOIA litigation.  If the CIA is able to carry its burden by merely saying that secrecy is important in national security matters – a proposition that no litigant and no court can challenge – then the courts have conceded to the CIA absolute authority to make the decision on secrecy, no matter what the specific facts in a given case show.

That is not how the system is supposed to work.  As Judge Sack wrote in a recent concurrence, Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 829 (2d Cir. 2015) (Sack, J., concurring), the executive branch necessarily enjoys broad authority to conduct secret operations in the national interest.  But our system still depends on the adversary system of the litigation and

the courts to make certain that the executive has not overstepped its bounds in insisting upon

secrecy in a given matter.

### III.

### THE CIA HAS FAILED TO SHOW THAT ACKNOWLEDGING THE EXISTENCE OF THE DOCUMENTS WOULD HARM NATIONAL SECURITY OR REVEAL SECRET SOURCES AND METHODS

The CIA's failure to justify its Glomar response is laid bare by the very structure of the

Shiner Declaration.  There are precisely two paragraphs (out of 36) that mention the words

"Iraq," "chemical weapons," "injuries," or "military personnel."  (See Shiner Decl. ¶¶ 5, 17.)

This is the declaration from central secrecy casting.  It is not a serious attempt to show why

secrecy is needed in *this* case for *these* documents at *this* time.  See Halpern, 181 F.3d at 295

(requiring agency to provide "reasonably detailed" explanations for its withholding).

Ms. Shiner spends seven paragraphs describing the concept behind a Glomar response (¶¶

9–15), at one point spinning out a hypothetical about secret information concerning a "specific

clandestine technology" that is not remotely similar to the kinds of documents at issue in this

case.  She then devotes seven paragraphs (¶¶ 18–24) to summarizing FOIA's statutory scheme

and relevant statutes.  Finally, at paragraphs 25 to 35, where one might reasonably expect the

"reasonable detail" required by the Second Circuit, the declaration instead floats off into generic

statements about how terrorist organizations operate (they "search for information regarding the

activities of the CIA"), the nature of intelligence-gathering (the CIA "utilizes both U.S. citizens

and foreign nationals"), the agency's relationships with its sources ("intelligence sources must be

certain that the CIA can and will do everything in its power to prevent the public disclosure of

their association with the CIA"), and truisms about intelligence methods ("Intelligence methods

must be protected from disclosure in every situation where a certain intelligence interest,

60478                                                             18

capability, or technique is unknown to those groups that could take counter measures to nullify its effectiveness").

In short, the entire justification for this Glomar response is cast in statements that could be trotted out in any declaration in any FOIA suit involving national security. One waits in vain for even a minimal attempt at connecting those security concerns to the facts of this FOIA request. It never comes. And the CIA makes no effort at all to show why a Glomar response is plausible after all the official disclosures of the agency's interest.

### A. Official Disclosures Have Vitiated the CIA's Right to Use a Glomar Response

The CIA's principal argument is that acknowledging the documents would disclose whether the CIA had "an intelligence interest in the subjects implicated by the [FOIA] request." (See Shiner Decl. ¶¶ 16, 27.) Of course, it is no secret that the CIA had an intelligence interest in Saddam Hussein's chemical weapons. As set forth in detail above in the Statement of Facts, the Government has repeatedly and officially disclosed the CIA's interest in that subject. Among the information that has been official acknowledged: the CIA's close tracking of Hussein's chemical munitions in 2002; the CIA's subsequent finding that Hussein did not have an active chemical weapons program after 1991; the CIA's involvement in the ISG and the Duelfer report with its extensive discussion of chemical weapons in Iraq; the CIA's disclosure of the existence of forgotten, discarded, or demilitarized chemical weapons from Iraq's pre-1991 stockpile; and the CIA's specific discussion of the chemical munitions' potential to harm U.S. troops and Coalition forces.

Why do those disclosures not thoroughly undermine the CIA's argument? One has to read the Shiner Declaration very carefully. Ms. Shiner avers that the Government has not officially acknowledged "the CIA's role, if any, in the collection and analysis of foreign

intelligence information related to Iraq's chemical weapons program *in December 2006, March 2007, and August 2007*." (See Shiner Decl. ¶ 17 (emphasis added).) Those of course are the dates of the three documents sought in The Times's FOIA request.

So the CIA's paper-thin argument really comes down to this: The CIA has officially acknowledged its interest in the Iraqi chemical weapons and its role in locating them – just not in three random months in 2006 and 2007.

That position makes a mockery of national-security secrecy. No U.S. enemy, having already learned officially of the CIA's interest at other times in the same era, will suddenly be empowered and enlightened by learning that the interest also existed in December 2006, March 2007, and August 2007. Put differently, if the timing is material to the need for secrecy and renders the prior disclosures irrelevant, then the CIA has the burden of explaining why. It has not even attempted to do so.

Nor is the CIA's case helped by pointing out that these three specific documents have not been specifically acknowledged by the agency. (See id.) The doctrine of official acknowledgment as it applies to documents is in flux. It is well settled in FOIA that "'[v]oluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption.'" N.Y. Times, 756 F.3d at 114 (quoting Dow Jones & Co. v. Dep't of Justice, 880 F. Supp. 145, 150–51 (S.D.N.Y. 1995)). The traditional "official acknowledgment" test was spelled out in Wilson v. Cent. Intelligence Agency, 586 F.3d 171, 186 (2d. Cir. 2009), which required that the information sought "match" the information already acknowledged. While the Second Circuit has not abandoned Wilson, it has questioned its scope and viability. In N.Y. Times, 756 F.3d at 120 n.20, the court cautioned that a narrow and literal reading of Wilson would lead to the absurd result that FOIA requesters are entitled to receive only what they

already have.  A "rigid application" of the *Wilson* test "may not be warranted," the court concluded.  Id.

In fact, a review of the <u>N.Y. Times</u> decision shows that the Second Circuit was not embracing <u>Wilson</u>'s matching test.  The case involved a Times FOIA request for the legal justification propounded by the Justice Department for targeted killings away from the field of battle.  <u>Id.</u> at 103.  The Second Circuit found that various public disclosures by senior Obama Administration officials about the legal reasoning waived the Justice Department's right to withhold a legal memorandum about targeted killings, subject to certain redactions.  <u>Id.</u> at 120–21.  Significantly, the court ordered the release of a section of the memorandum dealing with 18 U.S.C. § 956, a federal law outlawing murder abroad – a topic that had never been mentioned in any official disclosure.  <u>Id.</u> at 116.  Far from applying the matching test, the court instead found that the disclosure of that section would "add nothing to the risk" in light of the other disclosures.  <u>Id.</u> at 120.

The same analysis should apply here.  Disclosing the existence of documents from the three specific months would not add to whatever security risk may have resulted from the earlier official acknowledgments, and the CIA provides no argument to the contrary.

**B.  The CIA Declaration Fails to Show that Under either Exemption 1 or Exemption 3 the Agency was Justified in Declining to Acknowledge the Three Documents**

But even if official acknowledgment were lacking, the Glomar response would still be unwarranted.  The CIA identifies three rationales for its Glomar response: (i) acknowledgment of the documents would disclose confidential "sources and methods" (Shiner Decl. ¶¶ 28–35), (ii) acknowledgment might "weigh in" on the veracity of any anonymous source who revealed the existence of the documents to The Times (<u>id.</u> ¶ 17), and (iii) acknowledgement would disclose

the CIA's interest in the subjects raised by the FOIA request (id. ¶¶ 17, 26–27).  None of those justifies the secrecy the CIA seeks.

First, acknowledging the existence of the three documents would say absolutely nothing about secret sources and methods, which are protected under Exemption 3 and the National Security Act.  The documents are titled "Iraq: Recovered CW Munitions Probably Remnants of Pre-1991 CW Program," "Iraq: Recovered Pre-1991 Mustard Rounds May Pose Localized Threat," and "Iraq: US Forces Experienced First Sulfur-Mustard Related Injuries."  It may be that redaction will be needed in the production of the contents of the documents to protect sources and methods, but that is not the legal question directly before the Court at this juncture. The threshold legal question is whether the CIA can acknowledge the documents without revealing any secret source or method.

Second, the CIA's claim that it can avoid acknowledging that documents on the grounds that acknowledgement would "weigh in" on the credibility of The Times's anonymous sources is bizarre.  Put aside for the moment that any such sources have already spoken to The Times, been believed or not believed, and stories have already been published.  The CIA's argument is all speculation and conjecture.  If the CIA said no such documents exist, and a source had said that they do, the source's credibility would be placed in serious doubt – hardly an outcome that hurts national security.  On the other hand, if the CIA said the documents do exist, and a source had said the same thing, that would not be especially compelling evidence of the source's credibility. A source's accurate knowledge that three documents exist in the CIA archives is not some sort of acid test of credibility.  It is easy to imagine that someone may have great knowledge about the CIA's document holdings but no knowledge or credibility about the truly important things

covered in The Times's reporting:  how many service members were hurt, how they were hurt, how the Government tried to conceal the injuries, and how ill-conceived the mission was.

But all of that misses a more fundamental point.  The CIA's burden is to show that disclosure in response to a FOIA request "reasonably could be expected to cause identifiable or describable damage to the national security" and "pertains to" one of eight enumerated topics. See Executive Order 13,526.  Nothing about that standard encompasses concerns about the credibility of a newspaper's source.  Even if the CIA's theory had merit, the CIA has not identified or described any damage to the national security that would result in the future or how the enhanced credibility of a source pertains to any of the topics listed in the Executive Order. Any anonymous source has already spoken to The Times.  The CIA does not explain how a source's enhanced credibility would have an effect on national security at this point following the publication of articles by The Times, the truth of which has not been challenged.

That leaves only the CIA's third justification – disclosure of the agency's interest in Iraqi chemical weapons and the injuries to service personnel.   As an initial matter, the CIA does not explain how injuries to American service personnel in Iraq constitute some sort of national-security secret under the Executive Order.  Nor can the CIA plausibly argue that the agency's interest, disclosed or undisclosed, in those injuries has any bearing on national security.

As for the CIA's interest in the weapons themselves, the CIA is left to make the cramped argument that the secret to be protected by a Glomar response is whether or not it had an interest in the weapons in December 2006, March 2007, and August 2007.  The CIA must show why the agency's interest during those three time periods is properly secret under the standard set by Executive Order 13,526.  Simply put: How would acknowledgment of an interest in those three time periods jeopardize the national security when acknowledgment of such an interest in other

time periods did not?  Ms. Shiner does not even attempt to make that case in her declaration.

Instead, she relies on generic discussions of secrecy that would apply equally to those time

periods during which the CIA interest has been acknowledged as to the time periods at issue with

the three documents.

That does not carry the day for secrecy under either Exemption 1 or 3.

## **CONCLUSION**

For each and every of the reasons set forth above, The Times respectfully requests that

this Court deny the CIA's motion for summary judgment and grant The Times's cross-motion for

partial summary judgment by directing the CIA to (i) acknowledge the three documents at issue,

(ii) produce the three documents subject to any redactions the CIA believes can be made under

FOIA, and (iii) set further motion practice for any challenges that The Times has to such

redactions.  Further The Times respectfully requests that the Court award The Times the costs of

these proceedings, including reasonable attorney's fees, as expressly permitted by 5 U.S.C. §

552(a)(4)(E) and grant such other and further relief as the Court deems just and proper.


Dated: New York, NY
       July 1, 2016

                              Respectfully submitted,

                              By: _____s/ David E. McCraw_____
                                   David E. McCraw
                                   Tali R. Leinwand
                                   The New York Times Company
                                   Legal Department
                                   620 8th Avenue
                                   New York, NY 10018
                                   Phone: (212) 556-4031
                                   Facsimile: (212) 556-1009
                                   Email: mccrad@nytimes.com
                                   *Counsel for Plaintiff*

60478                                    24