G8OANYTAps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   THE NEW YORK TIMES COMPANY,

4                  Plaintiff,

5         v.                                16-cv-3098 (JSR)

6   CENTRAL INTELLIGENCE AGENCY,

7                  Defendant.

8   ------------------------------x

9                                          New York, N.Y.
                                           August 24, 2016
10                                         4:00 p.m.

11
    Before:
12
                          HON. JED S. RAKOFF
13
                                           District Judge
14

15                        APPEARANCES

16  THE NEW YORK TIMES COMPANY
    BY:  DAVID E. McCRAW, ESQ.
17       TALI R. LEINWAND, ESQ.

18  LEIGH A. WASSERSTROM, ESQ.
        Assistant United States Attorney
19

20

21

22

23

24

25

G8OANYTAps

1          (In open court)

2          THE CLERK:  This is *The New York Times* v. The Central

3     Intelligence Agency, Docket No. 16 Civil 3098.  Will everyone

4     please be seated and will the parties please identify

5     themselves for the record.

6          MR. McCRAW:  David McCraw for *The New York Times*,

7     plaintiff.

8          MS. LEINWAND:  Good afternoon.  Tali Leinwand for *The*

9     *New York Times*.

10         THE COURT:  Good afternoon.

11         MS. WASSERSTROM:  Leigh Wasserstrom from the United

12    States Attorney's Office for the CIA.

13         THE COURT:  This is a cross motion, so it doesn't

14    really matter who goes first, but why don't we hear first from

15    the government.

16         MS. WASSERSTROM:  Thank you, your Honor.  This case

17    arises from the CIA's *Glomar* response in response to requests

18    for three purported records.  Those reports are dated September

19    2006, March 2007, and August 2007.

20         THE COURT:  I haven't had a *Glomar* response

21    previously, and it creates an unusual situation in my view

22    because, in previous cases, I've been able to examine in camera

23    where there is a document whose existence is acknowledged, and

24    that often allows me to either determine that there would be

25    problem under FOIA in releasing the document or, many times,

G8OANYTAps

1    that redactions can solve the problem or something like that.

2    Here, your position is that to merely acknowledge whether there

3    is or is not such a document would compromise national

4    security, yes?

5              MS. WASSERSTROM:  That's correct, your Honor.

6              THE COURT:  How could that be, when there has already

7    been some disclosures of similar documents, such as a CIA

8    report drafted in January 2005 and classified in November 2013

9    that concluded that small numbers of forgotten, discarded, or

10   demilitarized chemical weapons from Iraq's pre-1991 stockpile

11   continue to surface and pose a modest threat to coalition

12   forces?

13             MS. WASSERSTROM:  Your Honor, the issue before the

14   court in a *Glomar* case is the plausibility of the CIA's

15   justification for its *Glomar* response.

16             THE COURT:  Well, that's what I'm asking.  I agree

17   that's the standard.  How can it be plausible, when we have

18   some disclosures already, not to mention I seem to have a vague

19   recollection the whole reason we went into Iraq was to do away

20   with weapons of mass destruction, so it would hardly be

21   surprising that we were continuing to look for them and unearth

22   them and so forth.

23             MS. WASSERSTROM:  The basis for the CIA's *Glomar*

24   response here is that the classified fact is the CIA's

25   intelligence interest, if any, at the particular time of the

G8OANYTAps

1   purported dates of --

2            THE COURT:  What is it about the particular time that

3   implicates national security in a way that, for example, the

4   time that I just referred to does not?

5            MS. WASSERSTROM:  The reason why the CIA's interest in

6   a particular time is classified or is not classified is not

7   something the CIA can disclose in its declaration publicly.

8   But that's not required under the standard.

9            THE COURT:  Yes.  But now we're not in a realm of

10  plausibility.  Now we're in the realm of Trust me.  You're

11  saying, if I understand it -- correct me if I'm wrong -- we

12  agreed there were some disclosures of similar kinds of things,

13  such as the one I just mentioned, at a different time; we

14  agree, but we think that disclosure of any -- if there was such

15  a document in existence during this particular time, which was,

16  I think, December 2006 through August 2007, that, unlike the

17  earlier period, which was January 2005, would compromise

18  national security.  And the reason for that is, we can't tell

19  you.

20           MS. WASSERSTROM:  I think a couple of points to make,

21  your Honor.  First, the CIA's intelligence interests at a

22  particular time versus another time, it's plausible on its face

23  that the CIA would have an interest in particularly a later

24  time period but not an earlier.

25           The other thing I want to draw the Court's attention

G8OANYTAps

1   to is the nature of the public documents the Times has

2   submitted in support of its motion, in particular the

3   plausibility that disclosure of the existence or nonexistence

4   of these purported records -- and the difference, namely,

5   between the documents that have been submitted.

6           I think your Honor pointed to, I think it's Exhibit J?

7           THE COURT:  Yes.

8           MS. WASSERSTROM:  Right.  That document is titled

9   "Iraq's WMD Retrospective Theory."  That document, even on its

10  face --

11          THE COURT:  Let me just pull it out.  Hold on a

12  second.

13          MS. WASSERSTROM:  Sure.

14          THE COURT:  Go ahead.

15          MS. WASSERSTROM:  So that document is "Iraq's WMD

16  Retrospective Theory."  That document and I think the previous

17  exhibit, Exhibit I, another document from a retrospective

18  theory, those are the CIA documents that the Times has provided

19  that are closest in time to the relevant time period we've

20  identified here.  I think both documents note that what those

21  documents are are retrospective analyses of past assessments in

22  light of investigations done by the Iraq survey group.

23          THE COURT:  Yes.  I think that may be.  But it goes

24  all the way up to, for example, I'm looking at page Exhibit J,

25  the fourth page of the document.  "This IA seeks to address the

G8OANYTAps

1   existence of an undeclared Iraqi chemical warfare effort or

2   chemical weapons stockpile in the period between 1991 and

3   2003."  So it's at least up through 2003, yes?

4           MS. WASSERSTROM:  The analysis, I'm not -- we would

5   agree with that.

6           I think that it's helpful also to look at, as alleged

7   in the complaint, the titles of the documents, the purported

8   titles of the documents that the Times has reflected here.

9   Those purported records, based on their titles and dates,

10  appear to reflect a CIA intelligence interest at a particular

11  time in a particular place on very specific topics.  And they

12  would likewise tend to reflect the existence of human sources

13  and specific collection methods.  That type of information does

14  not appear in any of the documents that the Times has provided

15  to the Court.  And the general information that's in the

16  documents that have been provided as exhibits to the Times'

17  motion provide general information as to the CIA's interest in

18  an earlier time period, and the analysis reflected therein are

19  retrospective.

20          THE COURT:  So how do we know that the document that

21  may or may not exist that they're asking for isn't of the same

22  nature?

23          MS. WASSERSTROM:  The *Glomar* response is predicated on

24  the fact that their existence or nonexistence is itself

25  classified because the CIA's intelligence interest, if any,

G8OANYTAps

1      during that time period is properly classified.

2              THE COURT:  Yes.  These reports show, while they may

3      be retrospective, they indicate that there was an intelligence

4      interest up through the time of the authorship of these

5      documents, yes?

6              MS. WASSERSTROM:  They may.  They do reflect --

7              THE COURT:  So what changed?

8              MS. WASSERSTROM:  The legal standard and the case law

9      makes clear that general disclosures do not undermine the

10     CIA's -- the plausibility of a declaration that states that the

11     fact of the existence --

12             THE COURT:  No, no.  Forgive me, but I really don't

13     understand that.  Let's take an extreme case.  Supposing you

14     had a disclosure that was dated January 30, 2005 and then

15     someone asked for a document that they believed existed that

16     was created on January 31, 2005, and you're saying that it

17     would still be plausible to assume that somehow the existence

18     of an intelligence interest that was disclosed on January 30,

19     that it was plausible nevertheless to believe that a disclosure

20     as of January 31 would somehow compromise national security

21     because it would show that a day later, the same intelligence

22     interest that had already been disclosed still existed?  That's

23     absurd.

24             MS. WASSERSTROM:  I think this case is different than

25     that.

G8OANYTAps

1        THE COURT:  I agree it's different.  But I don't think

2   it can be dealt with just as a matter of presumption, as my

3   hypothetical shows.

4        MS. WASSERSTROM:  I think that the presumption,

5   though, is not just in terms of the time period, which, in this

6   case you have analyses that may be dated January 2005 or

7   January 2006 but reflect an interest --

8        THE COURT:  Right.  But I don't know if that's equally

9   true of a document that may or may not exist that's in

10  question.  This is why I say this is a funny approach.  And

11  obviously I respect the ability of the government to make a

12  *Glomar* response, but they have to justify it.  It's a totally

13  different situation, a much more easy situation for a court to

14  deal with, when the government says, without disclosing to the

15  person seeking the document, the petitioner, the existence or

16  nonexistence, we will show it to the court and the court can

17  then see that it has a -- but that's not the approach you're

18  taking.  Now, you're free to take the *Glomar* approach.  But

19  then I think it puts you at the disadvantage of having to show

20  plausibility not just through vague references to presumptions

21  but through some other fact.

22        For example, if the government of Iraq had changed

23  from a pro-American to an anti-American government during that

24  period, then that would raise some plausibility.  But we don't

25  have any of that stuff here.

G8OANYTAps

1          MS. WASSERSTROM:  I do want to point out for your

2     Honor just that in a *Glomar* case, the presumptions are very

3     strong in favor of the government in terms of what it needs to

4     show to justify the *Glomar*, and it is not the presumption that

5     the government needs to explain why the fact on which the

6     *Glomar* is predicated is properly classified.  It's enough that

7     it is plausibly classified.  And the CIA's interest in a

8     particular time period that is significantly --

9          THE COURT:  Again, I'm having a little trouble

10     understanding that.  So when, in a situation where the

11     government has acknowledged, at least to the court if not to

12     the requesting party, that there is such a document, here it is

13     for in camera review, and then the court can immediately see,

14     oh, this is so different and it involves matters that are of

15     national intelligence and so forth, you're saying that,

16     instead, the presumptions should be strong against disclosure

17     where the court has been furnished with nothing, not even an

18     acknowledgment there is such a document, but is being told in

19     effect, we can't tell you anything about this, even whether it

20     exists, but trust us, if it did exist -- or, excuse me -- trust

21     us that to acknowledge whether it existed or not would

22     compromise national security, although we can't tell you why in

23     any respect.

24          MS. WASSERSTROM:  I think that, two things.  First of

25     all, the CIA's position in *Glomar* cases as a presumption is

G8OANYTAps

1    that providing an in camera or classified declaration to the

2    court is not required under the legal standard in which the

3    assessment of harm is entrusted to the agency.

4         THE COURT:  No, it's not required.  But it certainly,

5    in my experience and I think the experience of most judges,

6    turns what is otherwise vague and conclusory into something

7    where plausibility is immediately determinable.  So it's not

8    required, but it puts you in the position of having to rely on

9    what may be so vague as to not be convincing on the subject of

10   plausibility, notwithstanding presumptions.

11        MS. WASSERSTROM:  However, submitting a classified

12   declaration or a declaration for in camera ex parte review

13   itself can undermine the protection that *Glomar* provides to the

14   CIA.

15        THE COURT:  Only if it's disclosed, if the fact of the

16   production is disclosed to the party requesting the document,

17   right?  In other words, what you could have done in this case

18   was say to the Court, we are going to present you with a

19   document and accompanying affidavit on a strictly ex parte

20   basis and we're not going to disclose that we're doing that,

21   we're not even going to acknowledge that, but we give it to you

22   so that the Court, instead of dealing with all these sort of

23   vague situations, can assess the situation for what it's worth.

24   That wouldn't even acknowledge to the adversary that such a

25   document exists.  But that wasn't the path you chose.

G8OANYTAps

1          MS. WASSERSTROM:  That's right.

2          I do want to highlight one other issue which I think

3     bears on the national security analysis, which is, under

4     exemption 3, the issue before the Court really is the

5     plausibility that revealing the existence or nonexistence could

6     reveal sources or methods.  There is no additional showing of

7     harm to national security required to invoke that exemption.  I

8     think the declaration amply does that, and explaining that

9     revealing the existence of sources --

10          THE COURT:  Well, I hear you, and exemption 1 --

11     you're invoking two exemption, exemption 1 and exemption 3.

12     Exemption 1 has two elements, does it not?  That the document

13     or, in this case, the existence or nonexistence of the document

14     pertains to intelligence activities -- that is, I think,

15     conceded -- and, secondly, that unauthorized disclosures of the

16     information could reasonably be expected to cause identifiable

17     and describable damage to the national security.  Isn't that

18     right?

19          MS. WASSERSTROM:  That's correct, your Honor.  But

20     courts have held that that determination is entrusted to the

21     agencies and under exemption 3 no additional showing of harm is

22     necessary.  It's just that it falls within the exempting

23     statute, which in this --

24          THE COURT:  I don't know.  I hear what you're saying.

25     What case are you relying on that's binding on this Court for

G8OANYTAps

1   that proposition?

2           MS. WASSERSTROM:  I think if you look at the *ACLU v.*

3   *FCI* case -- I'm sorry.  Even in *Florez*, I believe the Second

4   Circuit discussed that issue too.

5           THE COURT:  Point me to where.

6           MS. WASSERSTROM:  Sorry.  I'm just looking through my

7   cases.

8           *Larson*, the D.C. Circuit case that we cite in our

9   brief.

10          THE COURT:  I'm sorry?

11          MS. WASSERSTROM:  *Larson*.  It's the D.C. Circuit case

12  we cite in our brief for that proposition.

13          THE COURT:  Yes.  And of course that's a case I must

14  take account of but it's not binding on this Court.

15          MS. WASSERSTROM:  I'm sorry.  I don't have the

16  citation.

17          THE COURT:  OK.  I'll take another look at that issue.

18          I've exhausted the questions I had.  Maybe we should

19  turn to your adversary unless there were other things you

20  wanted to raise with the Court.

21          MS. WASSERSTROM:  No, your Honor.  Thank you.

22          THE COURT:  Thank you very much.

23          MR. McCRAW:  Thank you, your Honor.

24          THE COURT:  So you're no longer, if I read your papers

25  correctly, maintaining there was a waiver here?

G8OANYTAps

1          MR. McCRAW:  Yes, your Honor.  That is correct.  I

2    guess I'm a victim of my own success in arguing *Florez*.  *Florez*

3    has, I think, now clarified that when we talk about official

4    acknowledgment we're talking about waiver, we're talking about

5    acknowledgment of a particular document.  But the great thing

6    about *Florez* in our opinion is, it has clarified that these

7    other disclosures, disclosures by the agency or disclosures by

8    other government entities, are part of the second step in the

9    analysis, which is, as you were focusing on, your Honor, in the

10   questions, the justification.

11         Here, the government relies ultimately on this time

12   distinction.  Nothing in their declaration speaks to that, not

13   that specific time, not time in general.  Ms. Wasserstrom

14   raised the issue of the titles of the documents, and I think

15   it's very important to look at those because they dovetail

16   with, I think, the point you were making, your Honor.

17   "Recovered CW Munitions Probable Remnants of Pre-1991 CW

18   program," that's the title.  That fact is disclosed in the very

19   document that you were discussing, Exhibit J.  Exhibit J is a

20   CIA document.  That's what it talks about, is pre-1991

21   remnants.  The second one, "Recovered Pre-1991 Mustard Rounds

22   May Pose Localized Threat," that is a fact disclosed in Exhibit

23   J you cited in your question.

24         The third one, though, probably tells us a lot about

25   this case.  The third one is "U.S. Forces Experience First

G8OANYTAps

1   Sulfer-Mustard Related Injuries," March 2007.  That is not a

2   secret.  The army has acknowledged that.  The army has talked

3   about its disgraceful handling of these cases.  600 or more

4   Marines and soldiers injured.

5          Part of the reason I bring up these titles is to point

6   out that acknowledging the documents has nothing to do with

7   sources and methods.  These documents can be acknowledged and

8   never mention sources, never mention methods.

9          It may be the government ultimately prevails here.  It

10  may be that in the document itself sources and methods are

11  such.  But at this point, the issue is whether acknowledgment

12  of the existence or nonexistence of documents reveals a

13  national security threat.  They have not made that case.

14         We have heard today an attempt to sort of polish this

15  idea of time as a factual question that's for the declarant.

16  The declarant could have and chose not to.  I've been involved

17  in *Glomar* cases, including *Florez*, including *New York Times v.*

18  *DOJ*.  The government in those cases put in classified

19  declarations.  The government in those cases have put in reply

20  declarations after we did exactly what we did here, say, look,

21  it's your document.  They have chosen to rely on a declaration

22  that is filled with generalities.  And the court, the Second

23  Circuit, was very clear on that when it said that "a *Glomar* is

24  allowed only in 'unusual circumstances' with a particularly

25  persuasive affidavit."  I do not believe that we have here a

G8OANYTAps

1    particularly persuasive affidavit.

2              As we set forth in our papers, it seems clear that

3    failure to address the disclosures and show why conceding or

4    denying these documents exist would disclose any national

5    security secret that hasn't already been officially disclosed

6    from our laundry list of ten or twelve declarations or ten or

7    twelve documents.

8              And with that, your Honor, I will rest.

9              THE COURT:  All right.  Very good.  Anything else that

10   the government wanted to add?

11             MS. WASSERSTROM:  If I may, your Honor, just a couple

12   of quick points.

13             THE COURT:  Yes.

14             MS. WASSERSTROM:  I think the government has made a

15   showing that revealing the existence or nonexistence of these

16   documents would reveal sources and methods.  I think the case

17   law is clear that the existence of sources or the existence of

18   methods is itself protected under exemption 3 in a *Glomar*

19   context.  I just want to point the Court's attention to those

20   cases, in particular *Gardels*, *Wolf*, *ACLU v. FCI*, and *Wilner*.  I

21   think those cases are important to remember that the

22   declaration statement that sources and methods would be

23   implicated by revealing the existence or nonexistence of these

24   documents can't be rebutted simply by a statement by the Times

25   that it doesn't understand or see how that's possible.

G8OANYTAps

1      Furthermore, given the titles of the documents, which

2  refer to things like CIA WIRe reports, it's entirely plausible

3  that revealing the existence or nonexistence of these documents

4  would reveal the types of sources and methods that are

5  protected by exemption 3.

6      THE COURT:  Doesn't that prove too much?  If I

7  understand your argument, the mere fact that the CIA has

8  authored a document, of any kind, on any subject whatsoever, by

9  the fact that it's the CIA, implicates national security and

10  could cause injury because only the CIA in your view can

11  determine whether it would cause injury or not.  Maybe I'm

12  misunderstanding your argument.  It sounds like the Court is

13  merely a potted plant, to use a very misused cliché.

14      MS. WASSERSTROM:  The Court is not a potted plant from

15  the agency's perspective at all.  But I think that the case law

16  is clear that revealing the existence or the fact of -- sorry,

17  I want to say this right -- revealing the existence or

18  nonexistence of these documents would reveal a CIA interest, if

19  any, and by revealing the target of the CIA's intelligence-

20  gathering operations, etc., the case law is very clear that

21  that can implicate sources and methods in a very plausible way.

22  And there are cases that take a very similar approach to

23  requests, in finding that sources and methods under exemption 3

24  are implicated in a *Glomar* context.  And I point the Court to

25  those cases which I think highlight that issue in particular.

G8OANYTAps

1          THE COURT:  But just so I understand, I can understand

2    that in certain contexts.  I'm having difficulty understanding

3    it in this context.  How does disclosing the fact that there

4    was, if there was, a document written in 2007 or whatever it

5    was, about or concerning disclosures in 2006, 2007 about the

6    existence of or discovery of or treatment of harms visited by

7    Saddam Hussain-stockpiled chemical weapons that were uncovered

8    somehow compromise, the fact that there was such a report

9    somehow compromises national security in a way that the

10   acknowledgment of a report that's already public record from a

11   year or so earlier did not compromise national security?  How

12   can that be?

13         MS. WASSERSTROM:  I think that the point is that the

14   acknowledgment of the CIA's interest at that time or the

15   existence, if any, the acknowledgment of an existence would

16   tend to suggest that the CIA -- this is in the declaration, so

17   I'm really just pointing the Court to portions of the

18   declaration.

19         THE COURT:  Yes.

20         MS. WASSERSTROM:  But if the CIA were to confirm that

21   these documents existed, it would tend to reveal that the CIA

22   had human sources at a particular time that have otherwise not

23   been disclosed.  And this is paragraph 30.

24         THE COURT:  It would tend to reveal that the CIA had

25   sources in Iraq -- oh, my God, what a surprise -- and somehow

G8OANYTAps

 1  revealing that would be compromising in a way that the already

 2  disclosed record of such sources in 2005 did not compromise?

 3      MS. WASSERSTROM:  The case law makes very clear that

 4  seemingly small or trivial pieces of information that are not

 5  in the public record can cause cognizable harm.

 6      THE COURT:  I understand that totally and that's why,

 7  if there were such a document, this Court would want to very

 8  carefully examine it in camera and might well conclude that

 9  none of it could be disclosed or might well conclude that only

10  small portions of it could be disclosed or whatever.  But

11  that's not what we're talking about today.  What we're talking

12  about today is whether the mere acknowledgment of the existence

13  of such a document can compromise national security.

14      MS. WASSERSTROM:  Can compromise sources, methods, and

15  potentially in a way harmful to national security.

16      THE COURT:  It seems to me your declarations don't

17  deal with that in any particularized way.  If I had a

18  declaration that said there were significant changes in the

19  government of Iraq or in the international situation, so that

20  the disclosures that have already been made from a year or so

21  earlier, the Court could well plausibly imagine that the

22  situation was very different or materially different in 2006-7

23  than it was in 2005.  But I don't have that kind of

24  declaration.  What I have is just simply boilerplate -- forgive

25  me -- of generalities that sometimes that could be the case:

G8OANYTAps

1    Well, yes, sometimes it can and sometimes it can't.  And the

2    presumptions are not conclusive.  They are relevant.  But the

3    Court ultimately has to make a determination of whether there

4    is anything there beyond vague generalities.

5           MS. WASSERSTROM:  One final point, your Honor.  In

6    terms of whether this is a vague declaration, boilerplate,

7    generality, this is addressed in the *Larson* case too, the fact

8    that national security cases raise similar concerns that may

9    require the CIA to use language that may seem boilerplate or

10   rote to the Court is frankly part of the nature of the national

11   security --

12          THE COURT:  Yes, I understand, but, you see, it's a

13   bootstrap argument, because what follows from that is that all

14   the CIA ever has to do to avoid having to even disclose the

15   existence of any document is to raise generalities about the

16   possibility that every document or any document could

17   conceivably, by its acknowledgment, compromise national

18   security.  That proves too much.  That is what I meant by "the

19   potted plant."  That means that the Court simply has to accept

20   generalities that would cover every document in every situation

21   and the CIA never has to disclose anything under FOIA.  And

22   that cannot be the law.

23          MS. WASSERSTROM:  Of course that's not the law.  And

24   the CIA has taken a close look at the issues here, that the

25   *Glomar* response is in good faith, and believes that it is

G8OANYTAps

1     properly justified on the basis of this declaration.

2               THE COURT:  Thank you.

3               MS. WASSERSTROM:  Thank you, your Honor.

4               MR. McCRAW:  Your Honor, may I respond to the

5     exemption 3 point and where when it is appropriate in *Glomar*?

6               THE COURT:  Yes.

7               MR. McCRAW:  *Wilner* is a good example.  Counsel

8     pointed that out.  The request in *Wilner* came from some law

9     professors after warrantless wiretapping was disclosed, I'll

10    mention by *The New York Times*.  What they requested was this:

11    "records obtained or relating to ongoing or completed

12    warrantless electronic surveillance or physical searches

13    regarding, referencing, or concerning any other plaintiffs."

14    You cannot answer that without acknowledging that there is

15    surveillance.  That's when 3 would come into play.  That's not

16    our request.

17               Thank you, your Honor.

18               THE COURT:  Thank you.

19               Did the government counsel want to say anything on

20    exemption 3?  I should have asked you that before.

21               MS. WASSERSTROM:  No.  Thank you, your Honor.  I think

22    that the Second Circuit cases in terms of the exemption 3 and

23    the harm in *Wilner* is the applicable standard.

24               THE COURT:  Very good.

25               I thank counsel for both sides for their very helpful

G8OANYTAps

1    arguments.  I will take the matter sub judice.

2              MR. McCRAW:  Thank you, your Honor.

3              MS. WASSERSTROM:  Thank you, your Honor.

4                              o0o

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25