UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE NEW YORK TIMES COMPANY, Plaintiff, | : | 16 Civ. 3098 (JSR) |
| - against - | : | |
| CENTRAL INTELLIGENCE AGENCY, Defendant. | : | |

**DECLARATION OF DAVID E. MCCRAW**
**IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR COSTS AND ATTORNEYS' FEES**

I, DAVID E. MCCRAW, state and declare as follows under penalty of perjury:

1. I am Vice President and Deputy General Counsel of The New York Times Company ("The Times"), publisher of *The New York Times* newspaper and nytimes.com. I am duly licensed to practice law in the State of New York and before this Court and serve as counsel of record for The Times. I make this declaration from my own personal knowledge in support of The Times's motion for costs and attorneys' fees.

2. On October 22, 2013, The Times submitted a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to Defendant Central Intelligence Agency ("CIA") seeking three documents relating to chemical weaponry in Iraq (the "Request").

3. The Request specifically sought:

a. "A document believed to be published in August 2007, bearing the approximate title, 'Iraq: Recovered CW Munitions Probably Remnants of Pre-1991 CW Program.'"

b. "A document believed to be published in Dec. 2006 as a CIA WIRe report and titled, 'Iraq: Recovered Pre-1991 Mustard Rounds May Pose Localized Threat.'"

c. "A document believed to be published in March 2007 as CIA WIRe report and titled, 'Iraq: US Forces Experienced First Sulfur-Mustard Related Injuries.'"

4. On December 30, 2013, the CIA denied the Request (the "Denial"). The CIA stated in the Denial that it "can neither confirm nor deny the existence or nonexistence of records responsive to [The Times's] request." In issuing this "Glomar response," the CIA relied on both FOIA Exemption 1, which exempts properly classified information, and FOIA Exemption 3, Section 6 of the CIA Act of 1949 and section 102A(i)(1) of the National Security Act of 1947.

5. The Times timely filed an administrative appeal with the CIA in January 2014 (the "Appeal").

6. On June 3, 2014, the CIA denied the Appeal in its entirety, stating that the agency had properly invoked FOIA Exemptions 1 and 3.

7. In October 2014, The Times published an interactive news feature (the "Article") that exposed what had largely been kept secret until that point: that scores of American service personnel had been injured when they were exposed to chemical weapons in Iraq following the U.S. invasion in 2004. *See* C.J. Chivers, *The Secret Casualties of Iraq's Abandoned Chemical Weapons*, N.Y. Times (Oct. 14, 2014), https://www.nytimes.com/interactive/2014/10/14/world/middleeast/us-casualties-of-iraq-chemical-weapons.html. A version of the Article was also published in the print edition of *The*

*New York Times* on October 15, 2014 on page A1. The Article shed a harsh light on the mismanagement of the mission by U.S. authorities, as troops were sent to neutralize abandoned Iraqi arms stockpiles without proper gear, training, or warning.

8. As a result of The Times's reporting, hundreds of cases of injuries to U.S. personnel were acknowledged by the Pentagon. *See* C.J. Chivers, *More Than 600 Reported Chemical Exposure in Iraq*, *Pentagon Acknowledges*, N.Y. Times, Nov. 6, 2014, *available at* https://www.nytimes.com/2014/11/07/world/middleeast/-more-than-600-reported-chemical-weapons-exposure-in-iraq-pentagon-acknowledges.html (quoting Jerome Buller, a spokesman for the Army surgeon general).

9. The Times hoped that the publicity and official inquiry into the injuries would prompt further disclosures from the CIA and other agencies as Times reporters continued to gather information about the chemical weapons and the mission to destroy them.

10. However, those disclosures were not forthcoming. Accordingly, on April 26, 2016, The Times commenced this action, seeking three documents that The Times believed were critical to telling the full story of the chemical weapons.

11. On June 13, 2016, the CIA moved for summary judgment, arguing that its Glomar response was justified. The CIA claimed that it could neither confirm nor deny whether the three documents existed and that any other response would disclose whether the CIA had an intelligence interest in the Iraqi chemical weapons and the efforts to eradicate them after the fall of Saddam Hussein.

12. The Times responded with a cross-motion for partial summary judgment on July 1, 2016. The Times argued that the Glomar response should be set aside and that the CIA should be required, as an initial step, to provide a Vaughn Index of the documents, setting forth the basis for any withholding.

13. The Times's motion was far from typical for a FOIA case, which often turns on legal arguments about the scope and applicability of FOIA's exemptions. This case, in contrast, required substantial research into publicly available documents about the CIA and Iraq's chemical weapons program (the "Prior Disclosure Documents"). *See* Docket Nos. 15 and 16 and Exhibits thereto.)

14. As a result of that research, The Times was able to locate more than nine documents that revealed the CIA's involvement in monitoring chemical weapons or in the program to neutralize them. *See* Docket Nos. 15 and 16. Those Prior Disclosure Documents, which The Times submitted as part of its moving papers, undermined the CIA's claimed right to issue a Glomar response.

15. Yet, rather than acknowledge the obvious – that its Glomar response was unsustainable – the CIA persisted in standing by its Glomar response. On July 22, 2016, the CIA filed its reply brief, Docket No. 17, relying heavily on the district court decision in *Florez v. Central Intelligence Agency*, No. 14 Civ.1002 (SHS), 2015 U.S. Dist. LEXIS 20009 (S.D.N.Y. Feb. 19, 2014). The reliance was especially misplaced since – as the CIA knew well as a party – the Second Circuit had set aside the district court's decision earlier that month and remanded the matter in a decision that substantially clarified how Glomar responses were to be treated in this circuit. See *Florez v. Central Intelligence Agency*, 829 F.3d 178 (2d Cir. 2016).

16. The CIA then filed an amended reply brief, Docket No. 18, which largely rendered the Second Circuit's decision in *Florez* to a footnote.

17. On August 3, 2016, The Times filed its own reply, addressing in detail the impact of the new *Florez* decision in Glomar cases. *See* Docket No. 19.

18. On August 24, 2016, the parties appeared for oral argument. The Court made repeated reference to the Prior Disclosure Documents and asked the CIA to explain how its Glomar response could be justified in light of them. The transcript is available as Docket No. 26.

19. It apparently became clear to the CIA that it had not made its case. But rather than withdraw the Glomar and provide a proper FOIA response to The Times, the CIA further drew out the proceedings (and delayed access to the requested documents) by seeking permission to file a classified declaration. *See* Docket No. 20.

20. The Times opposed that application. *See* Docket No. 21. The Court granted the application on September 6, 2016. *See* Docket No. 22.

21. After waiting nearly another two weeks, the CIA finally abandoned its Glomar response and withdrew its motion for summary judgment on September 19, 2016. *See* Docket No. 25.

22. Over the next three months, the CIA provided redacted versions of the three documents requested. The review of the redacted versions required us to look at all the other disclosures that had been made previously. We also reviewed the materials produced in the companion case brought by The Times against the Department of the Army, *The New York Times Company v. Department of the Army*, 16 Civ. 03123 (JSR). That review was necessary to determine whether the CIA had unduly redacted portions of the three produced documents.

23. After review of the materials, The Times informed the CIA that it intended to challenge certain of the redactions. The CIA responded by agreeing to unredact certain parts of the documents. Ultimately, The Times agreed to seek no further disclosures in the three documents. *See* Docket No. 30.

24. I have personally litigated more than 30 FOIA cases in this district over the past 14 years as The Times's lead FOIA litigator. A check of PACER shows that during that period no attorney has litigated more FOIA cases in this district than I have.

25. I was admitted to the bar of New York State in January 1993. I served as a law clerk to Judge Richard D. Simons on the New York State Court of Appeals. I was later a litigation associate at Rogers & Wells and Clifford Chance in New York. From 2000 to 2002, I was deputy general counsel of Daily News, L.P., the publisher of the New York *Daily News*. I joined the Legal Department at The Times in 2002.

26. I have been lead counsel in FOIA cases involving a host of agencies, ranging from Housing and Urban Development and the Treasury to the National Security Agency and various units of the Department of Defense. I won my first FOIA case in 2004 before Judge Scheindlin, who ordered the release of a Department of Labor database showing the most dangerous places to work in America. *See New York Times Company v. Dep't of Labor*, 340 F. Supp. 2d 394 (S.D.N.Y. 2004).

27. In 2008, our FOIA suit against the Department of Defense led to the release of hundreds of pages of documents showing how the Pentagon used retired generals and admirals to sell the war in Iraq to the U.S. public. Those documents were critical to a Times series that won the Pulitzer Prize for David Barstow. *See* David McCraw, *How I Got the Story: David McCraw*, Columbia Journalism Review, April 29, 2009, *available at*: http://www.cjr.org/campaign_desk/how_i_got_the_story_david_mccr.php

28. In 2010, our FOIA suit forced the Department of Treasury to reveal the names of individuals who had obtained government licenses to conduct transactions in sanctioned nations. See *The New York Times Company v. U.S. Dep't of the Treasury*, 09 Civ. 10437, 2010 U.S. Dist.

LEXIS 109933 (S.D.N.Y. Oct. 12, 2010). Judge Maas's decision was an important decision on the scope and limits to FOIA's privacy exemptions.

29. Treasury paid us $20,000 for our fees in the case in a negotiated settlement. See 09 Civ. 10437, Docket No. 31. The amount was less than might otherwise be expected because we received substantial assistance from students in a FOIA clinic at Yale Law School.

30. In 2013, we won a FOIA case and obtained records from the Department of Homeland Security ("DHS") about the ineffective program to deport persons convicted of serious crimes. *See New York Times Company v. Dep't of Homeland Security*, 959 F. Supp. 2d 449 (S.D.N.Y. 2013). DHS agreed to pay us $35,000 in attorneys' fees in a negotiated settlement. *See* 12 Civ 08100 (SAS), Docket No. 18.

31. In 2014, the Second Circuit handed down one of the most important decisions rendered in a national security FOIA case, *New York Times Company v. Department of Justice*, 756 F.3d 100 (2d Cir. 2014). The court ordered the release of Department of Justice ("DOJ") memoranda providing the legal justification for targeted killing of terrorist suspects, including U.S. citizens, away from the field of battle.

32. As a result of our in-house work on that successful appeal, DOJ paid The Times $100,000 in legal fees in a negotiated settlement. *See* 11 Civ. 09336 (CM), Docket No. 59.

33. I also argued the successful Second Circuit appeal in the *Florez* case in 2016. That case substantially clarified the law surrounding the use of Glomar responses and recognized that the courts should consider all public disclosures, not just official acknowledgements by the defendant agency, in considering whether the Glomar was justified.

34. In various other cases, we have obtained the release of thousands of pages of government documents, either through successful motion practice or through settlement

negotiations following the commencement of litigation. I believe that record clearly establishes my expertise and experience in FOIA litigation, a record that is equivalent or superior to that of any outside counsel who might be hired in New York to undertake a FOIA case.

35. I have reviewed the standard rates charged by two partners at two law firms in New York with practices largely devoted to media law. They charge $625 to $700 per hour. In seeking fees in this matter, I have used a rate at the lower end of that range: $650.

36. Two junior attorneys worked on this matter. Tali Leinwand is a 2015 graduate of Columbia Law School. She worked at The Times in 2015 – 2016. She is now a law clerk to a judge at the Third Circuit Court of Appeals.

37. Ian MacDougall replaced Ms. Leinwand in September 2016. Mr. MacDougall is a 2014 graduate of Columbia Law School. He clerked for Chief Judge Amon of the Eastern District of New York for one year. He then clerked for one year for Judge Rogers of the D.C. Circuit Court of Appeals.

38. My research on fees at the two media law firms shows junior associates billing at $390 to $405 per hour. In seeking fees for this matter, I have used the rate of $400.

39. The time logs for all three of us are attached as Exhibit A to this declaration.

40. Because of the press of our other duties as in-house counsel – among other things, vetting articles for publication, working on commercial and patent litigation, dealing with subpoenas on reporters, handling an array of other FOIA cases and court access matters – we have to work efficiently. In reviewing the time sheets and comparing them to bills we receive from outside counsel, I am confident that we have billed far fewer hours than would have been billed by an outside firm.

41. We also incurred $539.86 in costs. We paid $400 as the S.D.N.Y. filing fee. We also spent $139.86 to obtain a transcript of the oral argument in this matter.

42. We try to be judicious in our request for fees. For instance, we are not seeking fees in the companion case against the Department of the Army even though our suit prompted the disclosures of hundreds of pages of documents. Because no legal briefing was ever required, and because we felt the Army worked with us to reach a sensible resolution of the matter, we decided not to pursue a fee award or even recover our filing fees.

43. We logged the following hours during the course of this litigation, including time spent on this application for fees:

a. Tali Leinwand 56.40 hours ($22,560)

b. David McCraw 47.80 hours ($31,070)

c. Ian MacDougall 15.60 hours ($6,240)

44. We will also incur time in drafting a reply brief on this fee application. Rather than supplement this declaration, we ask the Court to recognize an additional $1,500 in respect to that anticipated work.

45. In sum, we respectfully request a total award for costs and attorneys' fees of $61,909.86.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, NY
January 25, 2017

/s/ David E. McCraw