UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE NEW YORK TIMES COMPANY,<br>Plaintiff,<br>v.<br>CENTRAL INTELLIGENCE AGENCY,<br>Defendant. | Case No. 1:16-cv-03098-JSR |

**DECLARATION OF ANTOINETTE B. SHINER**
**INFORMATION REVIEW OFFICER**
**LITIGATION INFORMATION REVIEW OFFICE**
**CENTRAL INTELLIGENCE AGENCY**

I, ANTOINETTE B. SHINER, hereby declare and state:

## I. INTRODUCTION

1. I currently serve as the Information Review Officer ("IRO") for the Litigation Information Review Office at the Central Intelligence Agency ("CIA" or "Agency"). I assumed this position effective 19 January 2016.

2. Prior to becoming the IRO for the Litigation Information Review Office, I served as the IRO for the Directorate of Support for over sixteen months. In that capacity, I was responsible for making classification and release determinations for information originating within the

Directorate of Support. Prior to serving in the Directorate of Support, I was the Deputy IRO for the Director's Area of the CIA ("DIR Area") for over three years. In that role, I was responsible for making classification and release determinations for information originating within the DIR Area, which included, among other offices, the Office of the Director of the CIA, the Office of Congressional Affairs, the Office of Public Affairs, and the Office of General Counsel. I have held other administrative and professional positions within the CIA since 1986, and have worked in the information review and release field since 2000.

3. As the IRO for the Litigation Information Review Office, I am a senior CIA official and hold original classification authority at the TOP SECRET level under written delegation of authority pursuant to section 1.3(c) of Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010), reprinted in 50 U.S.C. § 3161 note ("E.O. 13526"). As such, I am authorized to assess the current, proper classification of CIA information based on the classification criteria of E.O. 13526 and applicable CIA regulations. Among other things, I am responsible for the classification review of CIA documents and information that may be the subject of court proceedings or public requests for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974, 5

U.S.C. § 552a. I have also been delegated declassification authority by the Director of the CIA.

4. The purpose of this declaration is to elaborate on the basis for the Agency's "Glomar" assertion and subsequent decision to withdraw its Glomar response. I make the following statements based upon my personal knowledge and information made available to me in my official capacity. This declaration is submitted in support of the CIA's response to the plaintiff's motion for attorneys' fees.

## II. PLAINTIFF'S FOIA REQUEST AND THE CIA'S RESPONSE

5. By letter dated 22 October 2013, the plaintiff submitted a FOIA request to the CIA's Information and Privacy Coordinator seeking three intelligence reports relating to chemical weapons in Iraq, published between December 2006 and August 2007. The request specifically sought: (1) "[a] document believed to be published in August 2007, bearing the approximate title, 'Iraq: Recovered CW Munitions Probably Remnants of Pre-1991 CW Program'"; (2) "[a] document believed to be published in Dec. 2006 as a CIA WIRe[1] report and titled, 'Iraq: Recovered Pre-1991 Mustard Rounds May Pose Localized Threat'"; and (3) "[a]

---

[1] CIA's World Intelligence Review ("WIRe") is an enterprise website hosted by the CIA that provides analysis, clandestine reporting, and open source content to policymakers and the Intelligence Community. The WIRe program brings together Agency intelligence products from all the Directorates into one place for policymakers, US military, Intelligence Community, and other federal government organizations.

document believed to be published in March 2007 as CIA WIRe report and titled, 'Iraq: US Forces Experienced First Sulfur-Mustard Related Injuries.'"

6. By letter dated 30 December 2013, the Information and Privacy Coordinator responded that the CIA could neither confirm nor deny the existence or nonexistence of records responsive to the plaintiff's request, as the fact of the existence or nonexistence of the requested records was currently and properly classified and protected from disclosure by statute. The plaintiff later appealed the CIA's determination to the Agency Release Panel, which ultimately denied the appeal and affirmed that the "fact of" the existence or nonexistence of the three requested records was currently and properly classified and related to intelligence sources and methods information that was protected from disclosure by statute.

7. In April 2016, the plaintiff filed the complaint initiating this action. On 13 June 2016, the CIA moved for summary judgment, relying on my prior declaration in this matter. In that declaration, I stated that "[a]lthough the plaintiff's complaint alleges that 'the Government officially acknowledged many of the details of the chemical weapons program and the injuries sustained by military personnel,' the existence of the requested records has not been officially acknowledged, nor has the CIA's role, if any, in the collection and analysis

of foreign intelligence information related to Iraq's chemical weapons program in December 2006, March 2007, and August 2007." My 10 June 2016 declaration also noted that "if the CIA were to confirm the existence of the purported records, it would tend to confirm that all of the information provided to the plaintiff by an unnamed or anonymous source - the records themselves, or the approximate dates and titles of the records - is accurate. Consequently, the CIA's simple response to an unauthorized disclosure of information could cause much greater harm by validating the source of an anonymous leak and tending to confirm that all of the information (e.g., related intelligence activities) documented within the purported records is accurate."

8. On 24 August 2016, the Court heard oral argument on the parties' cross-motions for summary judgment. Following oral argument, the CIA sought permission to file a supplemental classified declaration in support of its motion. The Court granted that request on 6 September 2016.

9. On or before 19 September 2016, after careful consideration of the relevant equities at stake, the CIA ultimately decided to withdraw the Glomar assertion and agreed to make a discretionary release of the documents requested by the plaintiff. Because the Department of Defense ("DOD") and the Defense Intelligence Agency ("DIA") primarily owned the

information in the documents, the CIA coordinated with those entities, among others, to process the documents and assert applicable exemptions in accordance with the FOIA – ensuring that redactions in the documents were consistent with each other and with previous releases by the Agency, DOD, and DIA.

10. On or about 9 November 2016, the CIA produced redacted versions of the three documents to the plaintiff. On 7 December 2016, the plaintiff provided the CIA with a list of four specific types of redactions it intended to challenge. Using the list provided by the plaintiff, the CIA coordinated with DOD and DIA to reprocess the requested records, resulting in the release (or unredaction) of three of the four categories of information challenged by the plaintiff, as well as significantly more information that was not challenged by the plaintiff. The CIA produced final versions of the three requested intelligence reports on 16 December 2016, with redactions made pursuant to Exemptions (b)(1) and (b)(3).[2]

## III. GLOMAR ASSERTIONS IN RESPONSE TO UNAUTHORIZED DISCLOSURES

11. My prior declaration in this matter alluded to the fact that the CIA's response to an unauthorized disclosure of information could cause additional harm. While true, I was limited in my ability to describe, on the public record, the

[2] The three intelligence reports can be made available for the Court's in camera, ex parte inspection.

harm that could accrue when, as in this case, a FOIA requester is seeking to confirm the existence of records when the existence of the records had never been acknowledged and the titles of the records themselves were classified at the time of the plaintiff's request. In the paragraphs below, I will discuss some of the Agency's concerns in this case and why the Agency initially asserted a Glomar in response to the plaintiff's request.

12. In the FOIA context, the Glomar response is properly utilized when the "fact of" the existence or nonexistence of requested records is itself classified. Apart from an agency's authority to provide a Glomar response to a request for records under the FOIA – when the mere existence or nonexistence of the records is currently and properly classified under Executive Order 13526[3] – the Glomar response is an important tool used to mitigate the harm to national security that can arise in cases in which a FOIA requester seeks to confirm information obtained through an unauthorized disclosure. In this case, the plaintiff did not submit a general request for information about chemical weapons in Iraq, but instead asked for three specific pieces of classified intelligence reporting by title and date. The titles

[3] Section 3.6 of Executive Order 13526 states that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under the order or its predecessors."

of the reports remained properly classified at the time of the plaintiff's request,[4] and some of their content remains classified. Given that there had been no official acknowledgement of any of these specific intelligence reports, it appears the plaintiff received, at a minimum, the titles and dates of the documents by virtue of an unauthorized disclosure or "leak."

13. FOIA requests are initially processed by the CIA's Information and Privacy Coordinator. Each request is evaluated individually, and responses to requests are carefully considered in order to protect intelligence sources, methods, and activities, as required by Section 102A(i)(1) of the National Security Act of 1947 and Executive Order 12333. The form of the Agency's response is often dictated by the nature of the FOIA request. The CIA must review what has been officially acknowledged by the Agency, compare that to what is sought by the requester, and choose a response that protects the CIA's intelligence sources, methods, and activities - including

---

[4] The August 2007 report was classified "SECRET//NOFORN," and the title was marked "(C)" for "CONFIDENTIAL." The December 2006 CIA WIRe report was classified "TOP SECRET//SI-G//ORCON/NOFORN," and the title was marked "S//NF." The March 2007 CIA WIRe report was classified "SECRET//NOFORN," and the title was marked "S//NF." Executive Order 13526 states that information may be classified at one of three levels: TOP SECRET if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security; SECRET if its unauthorized disclosure reasonably could be expected to cause serious damage to the national security; and CONFIDENTIAL if its unauthorized disclosure reasonably could be expected to cause damage to the national security.

analytic activities. Requests for specific documents - such as those identified by title - are subject to particular scrutiny, and the affected CIA component is consulted to obtain background on the particular document and to ascertain whether the document has been previously released or declassified.

14. In general, if the CIA were forced to acknowledge the existence of classified records obtained through unauthorized disclosures, there would be profound implications for current and future intelligence capabilities and the CIA's mission. The initial response here contemplated that acknowledging the existence of these particular documents could confirm not only the substance of the classified reporting, but also establish that the source of the leaked information has access to, and the willingness to provide, national security information to those unauthorized to receive the information. The Glomar response in this case was asserted to protect intelligence sources and methods by not confirming the existence of these documents, which would, in turn, have substantiated the veracity of the leak and potentially the underlying reporting.

15. When formerly classified information is released through official channels, those authorized disclosures are carefully evaluated by officials familiar with the standards for classification and the underlying subject matter, and coordinated among the relevant equity-holders. For example,

Executive Order 13526 sets forth the processes that must be followed for mandatory declassification as well as declassification of information in the "public interest." See Executive Order 13526, Sections 3.1 and 3.5. These procedures leave no room for individual employees to substitute their judgment for the judgment of original classification authorities as to what information should be released to the public. Individual government employees are not original classification authorities, and are not in a position to properly evaluate the implications of releasing classified information and whether its disclosure would compromise national security in light of past acknowledgments or other factors. The leak of selected materials to the media or others not authorized to receive the information can compromise vital intelligence sources and methods and harm the Agency's ability to collect timely foreign intelligence. I am aware of a strong and direct correlation between unauthorized disclosures in the press and the loss of intelligence capabilities. As such, confirming the accuracy of leaked classified information, in and of itself, could reasonably be expected to damage national security in accordance with Executive Order 13526.

16. The targeted nature of the plaintiff's request put the CIA in a difficult position. This was not a broad request for information about chemical weapons in Iraq - which would have

allowed for disclosing the general existence of records on the subject. Rather, the plaintiff asked for three specific documents by title. In the face of such a specific FOIA request for classified information, Glomar represented the only response that effectively protected intelligence sources, methods, and activities. By initially refusing to confirm or deny the existence of these documents, the CIA avoided officially acknowledging classified leaked material, which not only preserved a measure of plausible deniability as to the content, but also prevented authorized holders of classified information or unauthorized recipients of such information from doing an end-run around official information release channels. In this type of situation, a Glomar response may also minimize the likelihood that the leaker would be encouraged to make additional disclosures to media organizations in the future.

17. The CIA recognizes the need for responsible transparency, but it must be balanced against the need to protect national security information. In 2014, the Director of National Intelligence signed two Intelligence Community Directives that apply to employees across the Intelligence Community. The directive on Whistleblower Protection ("ICD 120") advises personnel of the protections and review processes available to individuals for reporting violations of law, rule or regulation; gross mismanagement; gross waste of funds; an

abuse of authority; or substantial danger to public health or safety.[5] The directive on Media Contacts ("ICD 119") emphasizes that engagement with the press on intelligence-related matters, including sources, methods, and activities, must occur only through authorized representatives, such as an agency's public affairs office. These directives underscore the rights and responsibilities of national security professionals, and allow for the considered, orderly, and deliberate release of sensitive information within the proper channels. This case presents an instance where an individual who was not authorized to make an official acknowledgement on behalf of the government disregarded the proper procedures.

## IV. ISSUES RAISED DURING ORAL ARGUMENT IN AUGUST

18. I understand that the Court, during oral argument, sought additional information with respect to the relevance of the time period of the requested documents for purposes of its review. Notwithstanding the CIA's decision to release the documents as a matter of discretion, the Glomar assertion was appropriate in light of the differences between what was revealed or acknowledged by the exhibits to the plaintiff's motion for summary judgment and what was revealed when the CIA confirmed the existence of the requested records.

---

[5] This is not to say that revealing the existence of the requested documents in this case would merit whistleblower protection.

19. The plaintiff filed 13 exhibits with its cross-motion for summary judgment in order to demonstrate that the CIA's interest in Iraq's chemical weapons program and its role in trying to locate chemical weapons in Iraq had been acknowledged. Although some of the exhibits generally established the CIA's interest in Iraq's pre-war chemical weapons program and its efforts to locate chemical weapons - both before Operation Iraqi Freedom (OIF) and shortly after the start of the war - the exhibits do not reveal anything with respect to the CIA's analytic interest in Iraq's chemical weapons program beyond January 2006, or its operational role, if any, in the recovery of chemical weapons, after the publication of the Iraq Survey Group report (the "Duelfer report") in late 2004. In fact, the exhibits almost exclusively concern the CIA's efforts to review pre-war intelligence failures that led United States policymakers to believe that Iraq had a chemical weapons program after 1991. The exhibits proffered by the plaintiff did not address the topics of the three requested intelligence reports and did not establish the CIA's intelligence activities with respect to chemical weapons in Iraq beyond the timeframe of the Duelfer report. In contrast, the dates and titles of the requested documents speak to the interests and activities of the CIA between December 2006 and August 2007, and reveal that the

CIA continued to devote significant analytic resources to the issue of chemical weapons in Iraq.

20. This difference in time is significant because a specific acknowledgment of CIA activities during this later time period can inadvertently reveal clandestine relationships or clandestine operations to a sophisticated adversary paying attention. Accordingly, it remained my judgment, prior to the decision to withdraw the Glomar, that confirming or denying the existence or nonexistence of the requested records in this case was appropriate and justified.[6] Confirming the existence of the documents would reveal, among other things, the CIA's allocation of resources as well as the focus of specific intelligence-gathering efforts. The exhibits submitted by the plaintiff did not alter that determination.

21. Ultimately, despite the danger of confirming leaked information and disclosing the Agency's intelligence interest and activities outside of the acknowledged time frame, the CIA assessed that it could accept the risk in acknowledging the

---

[6] Separate from the question of whether the existence of the requested documents was itself classified, the CIA concluded that confirming the existence of the documents was likely to result in the disclosure of information relating to intelligence sources and methods in contravention of the National Security Act of 1947. As I noted in my prior declaration, the National Security Act states that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure," and is a withholding statute under Exemption (b)(3) - which provides an independent basis for asserting a Glomar in this case. Exemption (b)(3) and the National Security Act do not require the CIA to identify or describe the damage to national security.

three specific analytical reports requested by the plaintiff under the particular circumstances of this case. The decision was made with the knowledge that based upon the criteria in Executive Order 13526, the Glomar response here could still be maintained. However, after careful consideration of information in the public domain, the passage of time, and the calculated risks of disclosure, I determined that the CIA could release redacted versions of the documents as a matter of administrative discretion.

22. Additionally, the CIA was also sensitive to the public's concern that classified submissions in FOIA cases subvert the adversarial process and, in some cases, can prevent the public from learning about information that should be in the public domain. In cases in which the Agency is seeking to justify the withholding of a record or part of a record because the information is classified, it often files a classified affidavit with the court, and makes the records themselves available for the court's in camera and ex parte review, to explain in greater detail the nature of the information withheld and why public disclosure of the information could reasonably be expected to cause some level of damage to the national security. The same calculus does not apply in the Glomar context. Here, if the CIA had submitted a classified declaration in support of its Glomar response, it would have tended to confirm the

existence of the records sought by the plaintiff. Similarly, if a FOIA request was directed to the CIA and sought records relating to a particular individual, a classified declaration would suggest that there was a clandestine relationship between the individual and the CIA.

**V. CONCLUSION**

23. For all of the reasons described above, the CIA's decision to assert a Glomar was grounded in Executive Order 13526 and informed by the circumstances of this case. I note, however, that the CIA's decision to withdraw the Glomar was made as a matter of discretion - and will not affect the classification calculus applied to other requests. The Glomar assertion was made in good faith and was not designed to avoid embarrassment or frustrate the plaintiff. As such, awarding fees in cases such as these - where the Agency had a reasonable basis in law for its position - will discourage agencies, including the CIA, from making discretionary releases in the future.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of February 2017.

Antoinette B. Shiner

ANTOINETTE B. SHINER
Information Review Officer
Litigation Information Review Office
Central Intelligence Agency